UNITED STATES DISTRICT COURT

Middle District of Florida

Case No.: 3:24-cr-86(S1)TJC-SJH

NESTOR ROJAS,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

NOTICE OF SUPPLEMENTAL AUTHORITY

Petitioner, Nestor Rojas, respectfully submits this Notice of Supplemental Authority to inform the Court of additional relevant information supporting his pending motion under 28 U.S.C. § 2255.

On March 10, 2025, Petitioner's formal complaint to the Department of Justice's Office of Professional Responsibility (OPR) was received, documenting prosecutorial misconduct and Brady violations in this case. Specifically, the complaint details how material exculpatory evidence was withheld despite internal advisements that the prosecution should not proceed.

The OPR complaint was received on March 10, 2025, with the following tracking information:

USPS Tracking No.: 9589071052701902528538

Status: Delivered – Individual Picked Up at Postal Facility

Date & Time: March 10, 2025, at 5:18 AM

Location: Washington, DC 20530

This new information further corroborates Petitioner's claims in his § 2255 motion and underscores the constitutional violations that prejudiced his defense. Petitioner respectfully requests that the Court take notice of this development in its consideration of the pending motion.

Dated: March 14th 2025

Respectfully submitted,

Nestor Rojas

14929 SW 132 Ave

Miami, FL 33186

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

v.                                              CASE No.: 3:24-cr-86(S1)TJC-SJH

NESTOR ROJAS, Defendant

**NESTOR ROJAS'S RESPONSE TO UNITED STATES' MEMORANDUM OPPOSING MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

Nestor Rojas replies and rejects the United States' opposition to Rojas's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 USC § 2255[1]. Mr. Duva notes that the Court found a factual basis for my guilty plea. However, Mr. Duva does not state what the factual basis was and how the factual basis was premised on false information regarding the criminal conduct, false information ushered by the insurance companies to the United States government which caused a serious Brady violation and false information that was testified to in two criminal trials. Moreover, Mr. Duva asserts that I knew I was committing fraud when the urine samples, I and Mr. Aaron Alonzo obtained from outside labs never went to Campbellton-Graceville Hospital ("CGH") for testing, and at best were "accessioned" there but were not tested at CGH was the fraud. This was not the fraud or probable cause asserted against me or any of the other defendants. Because if this was truly the probable cause, why didn't the government obtain the test results from the independent labs as the best evidence to show the test did in fact

---

[1] I have sought the input of my fellow co-defendants and other individuals that have gone through other civil matters regarding the same subject matter in order to respond to the government's motion to oppose. I am filing this response with their assistance and I personally endorse this response as my own as I believe this response to be true

occur at the independent labs. This response perhaps will give the Court some insight as to why. The probable cause asserted in this case is as follows:

Claims for UDT's that were performed at an outside laboratory and/or, on behalf of persons who were not **inpatients or outpatients of the hospitals or from the area surrounding the hospital**, to be submitted to insurance companies using the hospitals NPI number and Tax ID. The claims were submitted to insurance companies without disclosing that testing had taken place at an outside laboratory or that the patients for who the UDT's were performed had **no connection to the hospital**, thereby making materially fraudulent representation and omissions about the nature of the testing in order to obtain reimbursements under the hospital's elevated contract rates with insurance companies[2].

The factual basis was proven false for all defendants, which is cause for this Court to vacate, set aside or correct my sentence. I will also assert additional causes to vacate, set aside or correct my sentence due to a serious Brady violation that directly involves Mr. Duva, Hayes and Winters against Kyle Marcotte and all the defendants as well as for knowingly filing false pleadings, eliciting false testimony and prosecutorial misconduct.

This Court must first understand the history of this case and what the defendants have endured at the hands of the insurance companies, which caused the United States government to give the defendants various theories of their prosecution. On June 17, 2020, I, along with my ten co-defendants, was indicted and two co-conspirators that pleaded guilty by way of information prior to June 17, 2020, began an odyssey that paralleled a Hollywood movie filled with suspense, lies, deceit and drama that ended in a pseudo comedy.

On August 22, 2016, Florida Blue and Agent Derek Holt arrived at CGH to investigate in excess of $50,000,000 paid to CGH for urine drug screens. Florida Blue and Agent Holt met with Julie Gallagher, a certified healthcare attorney who represents CGH, and asserted that the

---

[2] This is factual basis taken from Kyle Marcotte's factual basis which Mr. Marcotte entered a guilty plea to on July 9, 2019 (Docket 10).

claims were billed with a 22 code which represented that the patients were physically going to the hospital. On August 25, 2016, Julie Gallagher sends an email to Florida Blue and Agent Holt that the allegations that CGH submitted claims to Florida Blue with a 22 code was false and that the only code submitted to Florida Blue was a 141 code, which meant only the sample was submitted to the hospital for analysis. Additionally, Julie Gallagher went on to note that there was no place on the claim form that was submitted to Florida Blue to place a 22 code. This was the beginning of a saga that the insurance companies and United States government put the defendants through which continues to this day, which will be nine years in August.

On September 7, 2016, Florida Blue posted and published a nationwide alert via the National Health Care Anti-Fraud Association (NCHAA) stating that Williston Regional General Hospital ("RGH") was paid $37,000,000 for drug screens and that those claims were fraudulent or "false" because the claims included the code 22. In the summary of evidence to date, Florida Blue states that what is suspected is that labs were drawn in other states and the specimen was sent to RGH. The billing was **changed** to an outpatient hospital (22 code) and billed to Florida Blue. Data analysis confirmed that urine drug screens were being billed with a place of service 22 (Outpatient hospital) for out of state members. Florida Blue has the **correct scenario** where drug screens were being performed at the hospital and those samples were for out of state members that were sent to the hospital for testing but **what was incorrect** is that the billing was **changed** and that the 22 code was placed on the bills be the defendants.

On July 9, 2019, Kyle Marcotte enters a guilty plea to information that was supplied by Mr. Duva and Winters. Mr. Marcotte pleads guilty to money laundering. Mr. Marcotte, in his grand jury testimony where he was questioned by Mr. Tysen Duva, testifies that the specimens

he obtained did not have a **connection** to Chestatee Regional Hospital ("Chestatee") whatsoever. Marcotte further testified in the grand jury that none of the patients that supplied the specimens ever went to Chestatee. Mr. Marcotte testified in trial one and two that the prosecutors told him[3] the issue in this case was that the patients were never physically going to Chestatee. This assertion to Mr. Marcotte that the problem or false statement on the claims was that the patients were physically going to the hospital will be proven to be false and is the basis for a Brady violation.

On November 22, 2019, as stated in Aaron Durall and Neisha Zaffuto's malicious prosecution lawsuit against the insurance companies, there was a meeting between Durall's attorney's and Tysen Duva, Jim Hayes and Gary Winters. The prosecutors reported various pieces of false information provided to them by the Defendants, including claims that the rural hospitals where being used as billing vehicles and that the testing billed to the Defendants was not actually performed[4] at the rural hospitals. In response to questions from Durall's counsel about what was false on each claim, the prosecutors revealed the false information provided by the Defendants, was that all the claims had the Code 22, which falsely represented to the insurance companies that the patient had physically been to the rural hospital. The prosecutors stated that the inclusion of the outpatient 22 code was the "big lie".

Christian Fletcher was arraigned on June 30, 2020, and Mr. Duva issued his first oral presentation of the probable cause from the indictment. Mr. Duva and Mr. Steve Sadow, counsel

---

[3] Mr. Marcotte testified in the grand jury, trial one and two that he had no knowledge of how the billing was submitted

[4] During trial one and two the government conceded that vast amount of drug screening testing was performed at the hospitals. The government also presented three lab managers as witnesses during both trials and all three testified testing for drug screens were done at CGH, RGH and Chestatee.

for Mr. Fletcher, were attempting to agree on bond conditions for Mr. Fletcher who owned and operated two hospitals, Stokes and Early, when he was indicted. Mr. Duva states, "…any billings out of Stokes and Early **have to be for patients that actually went to the hospital** and have some connection to it, other…**so that would be an inpatient who is admitted or an outpatient[5] who is present at the hospital and receives a service and leaves the same day**." Mr. Duva further states during Fletcher's arraignment, "[A]nd this case is not about inpatient or outpatient billings. It really is about the non-patient[6] billings. As the allegations in the indictment reflect, **the government's view is that billings were involved with individuals that had no connection** to these hospitals whatsoever. The government is not concerned with lawful billings for **patients that go to a hospital**…" Here, Mr. Duva specifically outlines that all the defendants in this case are charged with submitting claims for non-patient or 141 bill type claims that had **no connection** to CGH, RGH, Chestatee or Putnam. However, the insurance companies submitted spreadsheets via a grand jury subpoena that asserted the defendants filed claims with an outpatient 22 code on every single claim, which meant that the patients were outpatients and pursuant to Mr. Duva and Theresa Jackson, an outpatient is someone, "who is present at the hospital and receives a service and leaves the same day." Therefore, on June 30, 2020, Mr. Duva established that every patient had to have visited the hospital for every claim to be legitimate or lawful in order for the insurance companies to pay for said claims.

On January 19, 2021, Mr. Duva and Mr. James V. Hayes, Department of Justice Criminal Division, Fraud Section, filed a Motion in Limine (Docket 211). The substance of the filing

---

[5] Theresa Jackson, an Aetna employee, testifies in the Grand Jury on June 5, 2019 and states that the Code 22 translates to outpatient services, meaning you walked into the hospital, had a service done, and at some point left the same day.
[6] A non-patient billing code is 141 which means the patient never visited the hospital and only the patient's UDT was sent to the hospital to be analyzed

asserts, "[T]he laboratory tests were billed through the rural hospitals even though **very little testing** took place at the hospitals, and, more critically, despite the fact that **none of the individuals whose specimens were tested had any connection to the hospitals**." Mr. Duva and Hayes, further state, the co-defendants, "operate[d] a fraudulent pass-through billing scheme designed to take advantage of the high reimbursement rates under the hospital's in network insurance contracts, to bill UDT's conducted at independent labs through CGH. The claims were submitted to Florida Blue, UHC and Aetna purportedly under the insurers' contracts with CGH but without identifying the independent labs where the tests were performed. The specimens were supplied by patients who never visited CGH or had any connection to the hospital." Finally, Mr. Duva and Hayes narrow down what is exactly false on the claim should the testing be completed at the hospital(s) by inserting a footnote on page 5 of the motion. Mr. Duva and Hayes state, "testing specimens at the hospital(s) does not legitimize the billing. The urine samples tested at Campbellton-Graceville (even if tested correctly) came from patients with no connection whatsoever to the hospital. The claims to insurance companies led insurers to believe that patients were indeed outpatients of the hospital or had some connection to the hospital. The claims did not inform the insurance companies that the patients who provided the specimen had no connection whatsoever to the hospital(s)." Therefore, even if specimens were tested at the hospital and billed with the appropriate laboratory codes that billing was still "a crime" because the insurance companies believed the patients were "indeed outpatients" of the hospital because the code 22 was placed on every single claim[7].

---

[7] It has been well documented during the two criminal trials that none of the defendants placed a 22 code on any of the claims, but the insurance companies themselves inserted this code on every claim thereby creating a fraud

On February 16, 2021, Mr. Duva, Hayes and Winters, filed an opposition to Fletcher and Durall's Motion to Dismiss (Docket 224) and double down on their probable cause to indict and try the defendants. The prosecutors stated, "[t]he laboratory tests were billed through the rural hospitals even though very little of the testing took place at the hospital, and **more critically**, despite the fact that none of the individuals who specimens were tested received treatment at or otherwise had any connection to the hospitals." Here the prosecutor's emphases by using "more critically" as the more important factor as to why there is a crime. Moreover, the prosecutors are admitting that specimens that were tested were not legitimate because the patients did not receive treatment or had any connection (as is noted previously this means that the patients were not inpatients or outpatients) to the hospitals. Finally, in the same motion the prosecutors state, "[I]nsurers will clarify that their contracts with the rural hospitals, as written, covered services provided at the hospitals' labs for inpatients and outpatients *of the hospital*[8]." The prosecutors have now cemented through meetings with Durall's attorneys, statements on the record with General Magistrate Toomey and filed documents within the criminal docket that the contracts are for only inpatient and outpatients of the hospital and the claims were submitted as though the testing took place at the hospital for outpatients of the hospital when in fact the claims were submitted for non-patients for specimens that were tested at the hospital.

On November 4, 2021, Brian Rafferty, Aaron Durall's attorney, issued a letter to Mr. Duva, Winters, and Hayes showcasing that the code 22 was not submitted on any claim to the insurance companies by the defendants. In fact, the now infamous letter to the prosecutors showed that the insurance companies had inserted the code 22 on every claim, and it was the

---

[8] Agent Robert Schwinger, who was the lead agent investigating this case, testified in the Grand Jury that he spoke to all the insurance companies and all the insurance companies stated that the contracts were only for inpatients and outpatients of the hospital

insurance companies that lied to the government in order to get the defendants prosecuted. The government relied on this information to prosecute the defendants and only this information because the government never obtained any test results from the hospitals or independent labs to ascertain if the testing had taken place at the hospitals or the independent labs. Therefore, even according to the government in their Motion in Limine (Docket 211) "testing specimens at the hospital(s) does not legitimize the billing. The urine samples tested at CGH (even if tested correctly) came from patients with no connection whatsoever to the hospital. The claims to insurance companies **led insurers to believe** that patients were indeed **outpatients** of the hospital or **had some connection** to the hospital. The **claims did not inform** the insurance companies that the patients who provided the **specimen had no connection** whatsoever to the hospital(s)." This is categorically false, and the claims submitted did in fact tell the insurance companies exactly that…the patients were non-patients and that only the specimen was submitted for analysis.

November 4, 2021, triggered the government's Brady obligation to all of the defendants. Because after Mr. Rafferty's letter to the prosecutors, the prosecutors had the legal and constitutional obligation to report to Kyle Marcotte or his lawyers that the information that was filed against him was **FALSE**. Moreover, Mr. Marcotte plead guilty to a crime that was not a crime and that information should have been presented to myself, Nestor Rojas, as well as every other defendant in this case. When Mr. Duva, Hayes, Winters failed to inform or disclose this material exculpatory evidence to all the defendants, that Kyle Marcotte plead guilty to a crime that wasn't a crime, a substantial Brady violation occurred.  When the Brady violation occurred[9], the first criminal trial convictions should be reversed because of the suppressed evidence was

---

[9] Brian Rafferty made repeated requests to the government to hand over any and all Brady materials

"material". This is not the first or last violation of the defendants' rights by the government and insurance companies.

On December 15, 2021, Mr. Duva and Winters, file a Memorandum Opposing Durall's Renewed Motion for a Bill of Particulars (Docket 477) and the prosecutors now attempt to change the meaning of the 22 code by using the CMS definition. The prosecutors state, "code "22" translates to "on campus-outpatient hospital," that is, [a] portion of a hospital's main campus which provide diagnostic, therapeutic (both surgical and non-surgical), and rehabilitation services to sick or injured persons who do not require hospitalization or institutionalization." Furthermore, the government states, "[T]he government agrees with Durall that neither the UB-04 nor the 837I has a place for a hospital to input the "22" code. Instead, as insurance company witnesses will testify, the "22" code is self-generated by the insurer based on the hospital's submission of the "141" type of bill code." Moreover, the government falsely states within the same filing on the criminal docket, "[F]urthermore, as the discussion above indicates, the "22" code does not "identif[y] the patient as someone who actually was at the hospital having his/her urine tested," as Durall erroneously contends[10]. Finally, the prosecutors state, "the Government, **has never alleged**, and does not intend to allege or prove, that the hospitals made a fraudulent misrepresentation by submitting Place of Service "22" code." This filing by the government is **false** and misleads the Court which this Court should sanction and issue a thorough investigation[11] of the prosecution of myself and my fellow co-defendants. The cause of this investigation is quite clear because Kyle Marcotte's factual basis, Christian Fletcher's arraignment, the government's Motion in Limine (Docket 211) and the government's Opposition

---

[10] Aaron Durall filed a Motion for Bill of Particulars and then renewed that motion which is Docket 449, at 4-5)
[11] This Court should issue or institute an Office of Professional Regulation complaint against the prosecutors in this case

to Durall and Fletcher's Motion to Dismiss (Docket 224) all substantiate that the government relied upon the notion that the patients were billed as outpatients, which is the 22 code. Additionally, the government was told by the insurance companies that the patients should have physically gone to the hospitals and because the patients had not physically gone to the hospitals the billing was fraudulent. There is more evidence of false information that was not in the criminal docket, which was the meeting at CGH with Julie Gallagher, the reply email by Julie Gallagher indicating that CGH did not bill with a "22" code[12], the NHCAA alert[13] issued by Florida Blue stating that RGH billed with a "22" code and finally the meeting with the prosecutors and Durall's attorneys on November 22, 2019, which the prosecutors stated that the "big lie" was the inclusion of the "22" code on every claim. Should the Court not believe this is enough to vacate, set aside or correct my sentence and institute an investigation, I shall state more, with false testimony by the insurance companies in trial one and two as well as prosecutorial misconduct in trial one and two by eliciting false testimony that occurred in this Court that was heard by this Court's jurors in order to render a verdict.

      The prosectors utilized Kyle Marcotte as an important witness to assert evidence of guilt upon Aaron Durall and Neisha Zaffuto. Mr. Hayes specifically questioned Kyle Marcotte about his guilt. Mr. Hayes knew the factual basis of Mr. Marcotte's plea agreement was false. Therefore, by eliciting testimony from Mr. Marcotte that he was guilty, it was prosecutorial misconduct. Furthermore, as previously stated, Mr. Duva, Hayes and Winters knew that there was exculpatory evidence[14] presented to Mr. Marcotte that was later determined to be false, and

---

[12] This was entered into evidence in the first and second trial
[13] This was entered into evidence in the second trial
[14] Mr. Marcotte's attorney(s) attended one or two proffers and during the proffer(s), notes were taken that would be the best evidence as to what was the crime as alleged against Mr. Marcotte by the government

the prosecution was aware of this information on or about November 4, 2021. Mr. Marcotte nor the other defendants were ever informed that the prosecution proceeded with a criminal narrative that was later found to be false and not a crime. This underscores that prosecutorial misconduct that should vacate, set aside or correct my sentence because my constitutional Due Process rights as well as the long standing <u>Maryland vs Brady</u> case has been violated by the prosecutors.

The filing on December 15, 2021 (Docket 477) by the government now shifts the theory of the prosecution and simply states, "the fraud is in representing that the lab tests for these non-patients were performed at a hospital" The prosecution further compounds a false statement in the criminal docket and to this Court by stating, "[E]veryone agrees that the patients were not at the hospital and had no connection to the hospitals, but the fraud is in representing that the hospital performed a service that it did not perform." Just a cursory glance at the indictment proves this to be false because the indictment specifically states that the patients had no connection to the hospital and it was not until Mr. Rafferty's letter on November 4, 2021, that the government knew this and just over one month later that government issues a motion on the criminal docket record that is utterly false[15]. The new theory by the government as of December 15, 2021, is that the defendants told the insurances companies in the claims that, "this is a test the hospital performed, so reimburse us under the hospital's contract." The new theory was promoted by Mr. Duva in his opening statement in trial one and two.

---

[15] Again the prosecution owed a duty to inform the defendants that the previous theory that the patients had to have a connection (were either inpatients or outpatients) to the hospital in order for a legitimate claim to be made to the insurance companies was now false

Mr. Duva's opening statement was that this case is not about drug screens[16] but about drug confirmations[17], which is what fueled this falsely alleged fraud scheme. During trial one the insurance companies as well as the experts presented by the government testified that the spreadsheets, which were the claims data, showed that the CPT codes billed by the defendants were paid as drug confirmations[18]. However, during the second trial those same insurance witnesses recanted their testimony by stating the codes were assigned descriptions by the insurance companies that shall fit the code and that those descriptions were **drug screens**. Furthermore, each insurance witness testified that there was a difference between a drug screen and a drug confirmation and that a drug screen was presumptive and that that a drug confirmation was definitive. Mr. Duva and Winters have filed with this Court a pleading which they state Kelly Tobin, an employee and witness who testified on behalf of United, and Theresa Jackson, an employee and witness who testified on behalf of Aetna, did not change their testimony when the word "screen" was in the claims data field under description and that the presence of the word "screen" did not change their view that the CPT codes referenced a billing for a definitive test. This statement is flat out untrue, and I challenge this Court to question those same insurance witnesses in order to ascertain the truth or just review their testimony. I will show the Court this statement is categorically **FALSE**.

The following is Jackson's testimony from the second trial. The following is Mr. Rafferty's cross-examination of Ms. Jackson:

> Q. So on March 22, 2019, you were interviewed by the government, right?
> A. Yes.

---

[16] Drug screens could be performed at CGH
[17] Drug confirmations could not be performed at CGH
[18] Dr. Kelly J. Clarke and Dr. Corey Waller both issued expert reports that showed the claims paid were for drug screens and not confirmations

Q. And the purpose of the interview was to help explain to the government these Excel spreadsheets, the claim spreadsheets you've testified to, correct?

A. That is correct.

Q. Okay. And the people that you spoke with were Mr. Duva and Mr. Winters?

A. Yes.

Q. The procedure codes, are you familiar with CPT codes? (Trial Transcript Volume VIII 36:22)

A. Yes, I am. (Trial Transcript Volume VIII 36:23)

Q. And does that appear to be, AX, CPT codes that are submitted with the claim? (Trial Transcript Volume VIII 36:24-25)

A. Yes, they are. (Trial Transcript Volume VIII 37:1)

Q. And AY, is that an Aetna interpretation of the CPT code that's provided? (Trial Transcript Volume VIII 37:2-3)

A. No, that is the full CPT description that was billed. (Trial Transcript Volume VIII 37:4)

Q. Okay. And box 44, that's where the CPT codes would go? (Trial Transcript Volume VIII 37:4)

A. That's correct.

Q. Okay. And the CPT code that goes there is a number, right, or a series of numbers or letters or some iteration of that?

A. Right. As…as it says, HCPCS. So there could also be letters as well as the numbers. So numbers are CPT. Letters are HCPCS.

Q. And there's no description on here. The description is put there by Aetna when the claim comes in?

A. Yes. I mean, it's assigned, yes.

Q. Right? So when a…when a hospital submits a bill, they submit what the code is and Aetna attaches the description to it in those spreadsheets we've seen, right?

A. That is correct.

Q. AY is something that is actually added by Aetna through the claim adjudication process, right?

A. Yes.

Q. And this is how Aetna defined each of the codes, correct?

A. That is the definition.

Q. Presumptive versus definitive drug testing. **Do you know presumptive to also be a screen**?

A. Yes.

Q. **Do you know definitive to also, in some instances, to be a confirmation**?

A. Yes.

Q. Okay. And those words are sort of used at times interchangeably?

A. Yes.

Q. And we saw in the (Aetna) policy document, (Durall Exhibit) 540, the drug screen codes were in that documents, right?

A. Yes.

Q. And they were 80320 to 80377, right? Those are drug screen codes, right?

A. Yes.

Q. You see **82542 says it's a drug screen**, too, right?

A. **Yes**.

Q. And it says **83789 is a drug screen, right**?

A. **Yes**.

Q. So looking in the middle of the document, do you see, Ms. Jackson, **80324? It says drug screen, right**?

A. **Yes**.

Q. And if you go right, a couple of lines below that, **80358 says drug screen**?

A. **Yes**.

Q. And **80365, it says drug screen**?

A. **Yes**.

Q. Right below that, **80372, it says drug screen**, right?

A. **Yes**.

Q. **80353, drug screen**, right?

A. **Yes**.

Q. And a little bit further down, **803345, drug screen right**?

A. **Yes**.

Q. Now with respect to the other spreadsheets, would the definitions that these are all drug screens be the same? And so I'm talking about 1K, 1K(1), 1L, 1L(1), and 1M, and 1M(1). The descriptions of the codes that were billed, they would all be the same?

A. Yes, they're industry standard.

Q. And **so these are all all drug screen codes we're talking about, right**?

A. **Yes**.


The testimony is quite clear that Theresa Jackson clarifies that the CPT codes used are for drug screens. Mr. Duva does a cross examination in an attempt to prop up his continued false claims before this Court.

Q. And Mr. Rafferty used the word "screen" and asked you questions about all these codes that are set forth there reference to a drug screen?

A. Correct.

Q. But what this policy is talking about is both, a presumptive test or a definitive or confirmatory test?

A. Correct.

Q. And to look at what these codes are, the better source might be a CPT manual?

A. Yes.

Q. Okay. And whoever bills for the service that's provided, whether it's provided or not, bills the CPT code?

A. Correct.

Q. So if someone wants to know how to bill a definitive or confirmatory drug test, you go to this thing?

A. Yes.

Q. And some of those definitive codes you've looked at, you would say the best source would be the CPT code book?

A. Yes.

The issue with Mr. Duva's logic is that if the spreadsheets, which he admitted to this Court during the first and second trial as business records and business records must be credible and trustworthy, state the codes are screens then you cannot go to an outside source such as the AMA coding book to assert what the insurance companies were billed and paid for were confirmations. Therefore, if according to the AMA coding book the CPT codes are definitive or drug confirmations then the spreadsheets that state those same codes are drug screens are not credible or trustworthy and should not have been admitted into evidence[19]. On the other hand, since the spreadsheets do state those CPT codes are drug screens and the government has conceded that drug screens were run at CGH, RGH and Chestatee, then Mr. Duva, Winters, and Hayes should not and can not file false pleadings by stating those CPT codes are definitive and that Ms. Jackson or Ms. Tobin's testimony[20] did not change when they testified the CPT codes were screens. Additionally, Ms. Jackson testified that Mr. Duva and the government reviewed

---

[19] Mr. Duva readily admitted that if the spreadsheets were not admitted into evidence then the government would not have been able to proceed with this prosection

[20] Kelly Tobin testified the CPT codes were confirmations the first trial and during cross examination Ms. Tobin admitted those same codes were drug screens as defined on the spreadsheets. Ms. Jackson affirmed during the second trial that the CPT codes were drug screens and not confirmations

those spreadsheets on multiple occasions, which cements that the insurance companies as well as the government knew that the vast majority of the tests billed and paid were for drug screens since the vast majority of the definitions on the spreadsheet clearly state drug screens. This is coupled with the fact that two expert witnesses issued reports stating that tests billed and paid for were drug screens[21]. This or any Court should sanction Mr. Duva, Hayes and Winters as well as report this issue to the Florida Bar and the Office of Professional Regulation for repeatedly filing false pleadings, eliciting false testimony and failing to abide by their Brady obligations, all in order to sustain a prosecution that should not have been brought forward once it was determined that the defendants did not bill the claims as though the patients were outpatients or with the 22 code.

The reason Mr. Duva, Hayes, Winters, and insurance companies had to have those CPT codes be definitive or confirmations is because once the code 22 (outpatient hospital) was found to be false, the only misrepresentation on the claim form would have to be that the testing was not performed at the hospital. However, the insurance companies, by way of their employee's testimony, the spreadsheets that show the CPT codes were billed as drug screens and the insurance companies themselves confirmed that drug screens were billed by assigning a description of drug screen to those same CPT codes and expert reports that stated the testing was for drug screens. Therefore, the defendants billed the vast majority of the claims[22] with the appropriate 141 non-patient bill type code as a drug screen then the vast majority of the claims did **not** have a material misrepresentation or omission; **thus, there was no crime**.

---

[21] This Court should review Dr. Waller and Dr. Clark's expert reports as well as the spreadsheets and make a reasonable determination as to what the insurance companies were billed and paid for
[22] Over 90 plus percent of the claims were billed and paid for as drugs screens

## **CONCLUSION**

What is this Court left with regarding my claim that my guilty plea be vacated, set aside or corrected? The aforementioned evidence that was documented within the criminal docket, trial testimony, grand jury testimony and discovery during the criminal case unequivocally shows that the prosecution committed multiple violations of my rights as well as my co-defendants. Moreover, the prosecutors and insurance companies committed multiple false presentations to this Court and the jury when testifying regarding the spreadsheets. This Court must seek justice which is the truth. This Court has great power, and I seek this Court to use its power in order to prevent an unjust. The unjust thing is that no defendant should be left with a criminal record when no crime was committed. I am respectfully requesting this Court to Order an investigation into this prosecution because as this Court has noted in a few of its rulings, this case may not have been criminal conduct, and the citizenry should not be subjected to this type of conduct by the insurance companies and United States government. As previously stated, prosecutorial misconduct, Brady violations, false witness testimony, repeated false pleadings in the criminal docket by the prosecution and false testimony in the Grand Jury have utterly obliterated the Constitutional rights bestowed upon myself and my co-defendants. If your Honor cannot order an investigation, I respectfully request that you refer me to the appropriate government entity so I may continue to pursue my request.

February 24, 2025,

By:_____
   Nestor Rojas